NINA P. WORKMAN, ADMINISTRATRIX, APPELLEE, v. LINCOLN TELEPHONE & TELEGRAPH COMPANY, APPELLANT.

FILED FEBRUARY 16, 1918.   No. 19775.

Electricity: PERSONAL INJURIES: LIABILITY. Damages may be recovered for the death of a person who, prompted by a purpose to protect others, was killed in voluntarily attempting to remove from a public street a heavily charged electric wire dangling there as the result of negligence, if he exercised reasonable precautions to protect himself.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, JUDGE. *Affirmed.*

*F. M. Hall, H. W. Baird* and *F. D. Williams,* for appellant.

*Berge & McCarty, contra.*

ROSE, J.

This is an action to recover damages in the sum of $30,000 for negligence resulting in the death of George B. Workman who was killed by an electric current at the intersection of Seventh and J streets, Lincoln Nebraska, October 7, 1913. The electricity was conveyed to him by a wire belonging to defendant's telephone system. The wire had been suspended on poles along J street, where it did not carry a dangerous current; but it broke, and in falling came in contact with a live wire connected with the lighting plant of the city of Lincoln. One end of the broken wire, with several

feet on the ground in the street, was thus charged from an electric light wire carrying 4,400 volts. After the telephone wire on the ground had been emitting sparks from 9 o'clock in the morning, or earlier, until 11 o'clock at night, Workman seized the end of it with pliers in his right hand, while holding a lantern in his left. The result was fatal. Plaintiff, his widow, is administratrix of his estate. In her petition she charged defendant with negligence in using a decayed wire; in failing to use insulation and guards as a protection from heavily charged wires beneath; in neglecting to make proper and timely inspection; in leaving the live wire on the ground in the public street for more than twelve hours. The negligence charged by plaintiff was denied in the answer, which contained also the plea that Workman, who had not been employed or directed by defendant, but prompted alone by his own will, went to the intersection of Seventh and J streets and voluntarily, unnecessarily and negligently attempted to handle the live wire, knowing the danger, assuming the risk, and losing his life in consequence. From a judgment on a verdict in favor of plaintiff for $6,000, defendant has appealed.

The evidence is sufficient to sustain a finding that the broken wire carrying the deadly current was on the ground in the street as the result of defendant's negligence. The record, therefore, presents this question: Did Workman's conduct prevent plaintiff from recovering damages? The position of defendant is indicated by the following excerpt from the brief:

"The evidence demonstrates that Workman's picking up the telephone wire, which was lying on the ground sparking and moving about with a manifestly heavy current of electricity, by the use of small pliers, inadequately insulated, when there was no immediate need for such action, which was entirely voluntary and not within his employment, but as a simple volunteer, was such negligence and assumption of risk of the mani-

fest danger involved as constitutes the proximate and only cause of his death and defeats recovery.''

In this connection attention is directed by defendant to evidence tending to prove the following facts: Workman was not employed or directed by defendant to handle the broken telephone wire. He had been in the employ of the Lincoln Traction Company as a repairer of electric street cars. While thus engaged he left the repair shop at night without his employer's permission, went two or three blocks to the place where the telephone wire had fallen, and voluntarily attempted to handle it. The task was not a duty of his employment. The pliers used were too small and not sufficiently insulated to protect him. Neither the broken wire nor the electric light wire belonged to him or to his employer. The sparks gave their own warning. Workman was told by a bystander not to pick up the telephone wire. The two men were the only persons near the place of danger at the time. The police department of Lincoln and the proper experts in handling heavily charged wires had been notified of the trouble. On evidence of these facts counsel assert that there should have been a peremptory instruction for defendant.

Formidable as the defense appears in the light of able advocacy, a different aspect of the case requires consideration. The attribute of human nature which prompts a man, though acting voluntarily, to remove from a public street a menace to the life or to the property of others is not beyond the protection of the law. The subtle agency which instantly destroyed Workman's life in a public street was wrongfully set in motion there by defendant.

Considering on one side this negligence and on the other the conduct of Workman in voluntarily attempting to remove the menace, does the law recognize no alternative but a nonsuit? The answer to this question requires consideration of evidence tending to prove the following facts: The Lincoln Traction Company, the

employer of Workman, had a building at Seventh and
J streets. Other buildings, including the office and
the shops where Workman repaired electric street
cars, were less than three blocks away. His employer,
at the intersection mentioned, had electric wires be-
neath those of defendant. Learning that a live wire
was down, Workman took a lantern and went to the
scene of the trouble. When he arrived a barber was
voluntarily acting for the moment as watchman. An
uninsulated iron wire, an eighth of an inch in diameter
perhaps, with several feet on the ground, was hanging
in the street from an electric light wire. As indicated
by sparks, the broken wire was not perfectly grounded.
It did not receive the entire voltage of the electric
light wire—a current sufficient to melt the small tele-
phone wire. These were the conditions when Workman
arrived. The barber, who was the only eye-witness, told
Workman not to pick up the wire, but the latter showed
a pair of pliers with the handles wrapped in insulating
tape, said they were safe, that he knew how to handle
the wire and that he would take it out of the way. For
more than six years he had been repairing electric
motors and applying currents of 500 volts. He was
not without experience in handling wires carrying such a
voltage. With his pliers he seized the wire, walked
backward and pulled it after him several feet without
mishap. He did not fall until the wire touched his lan-
tern. There is proof tending to show the facts thus
narrated.

Workman's conduct was consistent with his duties
to his employer. He was not an idle or curious meddler
or a trespasser. He had a right to be in the street. He
did not know that others would promptly remove the
dangling wire. The authority to remove from a public
thoroughfare wrongful obstructions and other dangers
is not limited to public officers or to representatives of
the wrongdoers. In public places a volunteer, prompt-
ed by a purpose to protect the lives or the property of

others, may perform reasonable acts necessary to the accomplishment of such a purpose. The freedom to so act implies risks. In commercial enterprises, where dangerous agencies are at work in the streets of cities, such conduct may be anticipated, if the occasion arises. In maintaining conductors of electricity in a city, it is the duty of a telephone company to take proper measures to keep its wires away from public travel and to guard against the escape of electricity by contact with other wires. In the performance of such duties, reasonable attempts of volunteers to remove live wires, if they fall in the streets, should be anticipated. Under the verdict of the jury defendant is answerable to plaintiff for the death of Workman, unless his conduct as a matter of law was such as to defeat a recovery. His warning not to pick up the wire did not come from an expert or from any one with authority to direct him. The test of his conduct is the exercise of reasonable precautions to protect himself under the circumstances. When the evidence and the conditions herein summarized are considered, it cannot be said as a matter of law that Workman did not exercise reasonable precautions to protect himself. In this view of the record, error requiring a reversal has not been found.

AFFIRMED.

Sedgwick and Cornish, JJ., not sitting.

Hamer, J., dissenting.

The deceased was injured by a telephone wire which appears to have been loose at one end and was throwing off electric sparks. The evidence shows that the telephone wire was fastened to a pole and was higher up than the electric light wires. It is claimed that it came in contact with the electric light wire and received a heavy charge from it. A witness for the plaintiff, George Bailey, saw the wire in the morning at about 8:30. This was in the morning before the man was killed. Ten or fifteen feet of the wire was upon

the ground. This witness also saw the wire in the afternoon. He testified that he said to himself that this wire was dangerous. He does not appear to have attempted to reach the office of the telephone company, nor did he communicate with the police. He appears to have stopped "the car and started to take a pair of pliers and move it over" the wire. He was driving a delivery car for the International Harvester Company. He took the pliers out of his car and got out to take hold of the wire, but he did not take hold of it. When asked why he did not take hold of it, he testified: "I thought I didn't have any right to fool with it." Apparently he exercised a wise discretion.

The Coroner, V. A. Matthews, testified that the wires next below the telephone wires were the city electric light wires; that this particular wire was in contact with "the city light." He testified that he took these pliers out of the dead man's hands. It was about 11:20 or 11:30 at night when Matthews got there. He testified that there were bare places on one handle of the pliers. He said the "char" had "been worn off of the bare places." He explained "the ashes that would natuarally be here where it is burned off." He explained that the ashes would be the tape that was burned. He testified: "Well, what caused those ashes, what was it ashes of? A. Insulation; this tape. Q. The ashes of the insulation, of that tape? Was that your answer? A. Yes, sir, it was either that or that of flesh; it would be hard to tell which. Q. You may state whether or not you could state from its appearance whether that was recent, or whether the destruction of that insulation was old? A. It was recent. Q. Now, you may tell the jury how you could tell it was recent. A. Why, as I handled it the char would crumble off. Q. Now, what crumbled off from these places that are now bare? A. Char, ashes."

I am under the impression that the barber who was present and who told the deceased not to take hold

of the wire gave him a sufficient warning. While I think that the telephone company was clearly guilty of negligence in permitting the wire to be in that condition from some time in the morning until after 11 o'clock at night, yet that would not authorize the decedent to commit suicide. I am under the impression that he did not exercise the prudence that would be exercised by an ordinarily prudent man under like circumstances. I have not sufficiently examined the instructions to see whether the trial court submitted to the jury the question of the defendant's negligence in using the pliers the way that he did. My impression is that the pliers were entirely insufficient, and that the deceased was guilty of a rash act when he took hold of the wire with the pliers. I think that the deceased should have sent the barber for help or he should have left the barber watching the wire while he went after help. There was no one thereabout to be killed, and, as there were two men there, one of them should have remained on the watch to protect the public from the wire and the other should have gone to notify the telephone company or the police or somebody else properly equipped to remove the wire. The pliers used were probably insufficiently insulated. Then they were probably too small, and therefore not adapted to handle a wire carrying so heavy a current.

While it is apparent that the telephone company was negligent because it permitted the wire to remain unprotected for many hours, the mere fact that its negligence gave the decedent the opportunity to risk his life and to lose it is no reason that it should be held liable. The decedent did not have to take the risk. What he did was done voluntarily and without any obligation upon his part. If the deceased undertook an unnecessary risk, there can be no recovery however heroic his conduct may have been. He could say to himself that any passer-by might come in contact with the wire and be killed, but it was easy to

prevent that by staying there by the wire or by getting some other person to stay. He was not in the employ of the telephone company. The current which killed the decedent came mostly from a live wire connected with the lighting plant of the city of Lincoln. The decedent had been in the employ of the Lincoln Traction Company as a repairer of electric street cars. Without his employer's permission he went to the place where the telephone wire had fallen and voluntarily attempted to handle it. The task which he set for himself was not a duty of his employment. It is said that Workman's conduct was consistent with his duties to his employer, but his relation to his employer imposed no duty upon him as to this wire.

If I had seen the wire sparking and apparently charged with a heavy current which made it dangerous I would not have taken hold of it. I would not have done that any more than I would have leaped to my death by jumping into a roaring cataract going down a steep declivity full of rocks. If I found another man there, as the decedent did, I would have said to him, "You stay and watch the wire while I go and get help, or I will stay and watch the wire and you go and get help." It was negligence to leave the broken wire dangling in the air, moving on the ground, charged with a heavy and dangerous current of electricity. The wrong of the company made the death possible, but it was not the proximate cause of the same. Did the conduct of the decedent contribute to his destruction? I think the rule is that he was required to exercise the prudence of an ordinarily prudent man under like circumstances. If the pliers were inadequately covered, if they were too small, or if they were for any other reason defective and inefficient and he took a risk which a reasonably prudent man would not have taken, then the verdict ought not to stand. There was nobody in immediate danger. It is one thing to protect the public and it is quite another thing to

take a needless risk. If I knowingly climb into a pen where there is an angry and vicious bull at large and I am gored to death because of the danger which I have invited, should the owner of the bull pay my administrator?