[No. 30647.   Department Two.   July 22, 1949.]

GRACE E. HEBER, *as Administratrix, Respondent,* v. PUGET
SOUND POWER & LIGHT COMPANY, *Appellant.*[1]

[1]Reported in 208 P. (2d) 886.

Simpson, J., dissents.

*Gordon H. Sweany, Geo. O. Moseley, W. R. McKelvy,* and *E. K. Brown,* for appellant.

*Cashatt & Turner* and *Gene F. Peterson,* for respondent.

ROBINSON, J.—This action was brought by Grace E. Heber, in her capacity as administratrix of the estate of Harry Heber, deceased, against the Puget Sound Power & Light Company to recover damages for the death of her husband as the result of alleged negligence on the part of the defendant in the manner in which it maintained a part of its electrical distribution system in the city of Ellensburg, Washington. The case was tried before a jury and resulted in a verdict in favor of the plaintiff. This appeal is from the judgment entered on the verdict.

There is evidence in the record which, if believed by the jury, was sufficient to establish the following facts: The Puget Sound Power & Light Company, as a part of its distribution system of electrical energy in the city of Ellensburg, Washington, maintained a power line along a public street in the city, which ran in an easterly and westerly direction to an alley and thence northerly along such alley. The decedent and his wife were the owners of the adjacent property, upon which was located their dwelling house and a chicken house, the latter building being a wooden structure situated in close proximity to the electric line, both in the street and alley. The transmission line consisted of three wires on cross-arms attached to poles. The wires were all on one side of the poles and about eighteen inches apart. The two outside wires were weatherproofed, but the middle wire was not covered. The line carried approximately 69,000 volts. The wires had been in use for many years, and some months before the date of the death of the decedent, they had been transferred to another set of poles. This transfer was made without turning off the current, and thus no substantial inspection was made of their general condition.

The wires had considerable sag. There was evidence to the effect that, if wires have too much sag, they tend to sway with the wind. When contact or near contact is made between wires, an arc is formed, and the wires may melt or become pitted and their strength consequently impaired. On three occasions, not long prior to the happening of the accident in question, one of the wires broke and fell to the ground. The appellant did not provide a ground-detecting device as required by statute.

Some time during the night of March 12, 1947, or in the early morning of March 13th, the uncovered wire broke and fell to the ground. At about two-thirty a. m., a flash was observed by a person who was then about five blocks away.

Mrs. Heber arose early and observed that the electric line was broken, and efforts were made to notify appellant, but without success. Shortly before seven a. m., fire was observed in close proximity to the chicken house. Mr. Heber threw two buckets of water upon the fire, but it was not extinguished. He then picked up a 2"x4" timber, about six feet long, and attempted to move the broken wire, which had come in contact with a wire fence. The wire was emitting sparks and was in active motion. The movements of Mr. Heber were observed by the members of his family. While Mr. Heber was attempting to move the end of the wire with the 2x4, he either came in contact with it or in such close proximity to it that an arc was formed, causing his death. None of the eye-witnesses was able to tell just what happened the moment before the accident occurred. There was evidence with reference to other relevant facts, but we deem the foregoing a sufficient statement for the purposes of this opinion.

The acts of alleged negligence, which we deem material and which have support in the evidence, are: (1) that the wires were old, badly worn, and of insufficient strength; (2) that, when they were moved to the place where they were strung at the time of the accident, they were not properly inspected and were allowed to sag to such an extent that prevailing winds might cause them to come together

and the current arc from one wire to another; and (3) that the appellant did not provide a ground-detecting device in its distributing system, as required by Rem. Rev. Stat., § 5435 [P.P.C. § 692-1].

The appellant timely moved the court for a judgment of nonsuit, for a directed verdict, and for judgment notwithstanding the verdict, or, in the alternative, for a new trial. It assigns as error the refusal of the court to grant its respective motions, the giving of certain instructions, and the exclusion of evidence. The further claim is made that the damages awarded were excessive.

In support of its claim of error in the refusal of the court to grant its several motions, the appellant contends that there was a failure of proof of negligence on its part, and that the decedent was guilty of contributory negligence as a matter of law.

■ The measure of care required by law of those engaged in the business of transmitting electricity, with reference to the construction and maintenance of their lines, is that of reasonable care, that is, such care as a reasonable man would use under the circumstances. The amount of care needed to satisfy this standard necessarily varies, but it must be commensurate with the danger involved. Where the wires installed and maintained by a carrier of electricity convey a strong and powerful current, highly dangerous to persons coming near to or in contact with them, the law imposes upon such carrier the duty of exercising the utmost care and prudence, consistent with the practical operation of its plant, to prevent injuries; and this is especially true in populous places, because the danger is great and the care exercised must be commensurate with it. These principles of law were recognized and applied in *Scott v. Pacific Power & Light Co.*, 178 Wash. 647, 35 P. (2d) 749. A very concise statement of the applicable rules appears in 18 Am. Jur. 443, Electricity, § 48.

■ We find sufficient evidence in the record of actual and statutory negligence to justify the action of the court in submitting the case to the jury and in its denial of the

motion for judgment notwithstanding the verdict on this branch of the case.

The appellant contends that the circumstances under which the decedent attempted to move the charged wire, testified to by members of his family, coupled with existing physical facts, show conclusively, and as a matter of law, that he was guilty of contributory negligence and that such negligence was a proximate cause of his death. The trial judge was of the opinion that the question of contributory negligence was a factual one for the jury to determine. In our consideration of the question presented, we recognize that it is very hazardous for a person to attempt to handle a highly charged electric wire that has broken and fallen to the ground, and that such person is bound to appreciate and foresee that injury to him may occur if he does so. With this thought in mind, we have examined the cases cited by counsel for both parties.

The decisions of the courts in many of the cases seem to turn upon the existence or nonexistence of a combination of two elements: (1) a situation which might prompt a reasonable man to act in order to save endangered property from damage or destruction, and (2) the method or means used in handling the charged wire.

If there is evidence that the property of a person is endangered by a fallen charged wire, and that, in making an effort to prevent danger to it or loss thereof, he adopts a method or means which a trier of fact might consider reasonable and proper under the circumstances, then the question of whether such person was negligent is one for the jury to determine. *Bricker v. City of Troy*, 315 Mo. 353, 287 S. W. 341; *Leavenworth Coal Co. v. Ratchford*, 5 Kan. App. 150, 48 Pac. 927; *Temple Electric Light Co. v. Halliburton* (Tex. Civ. App.), 136 S. W. 584 (Petition for rehearing denied, 104 Tex. 493, 140 S. W. 426).

In many of the cases where it has been decided that the injured person was guilty of contributory negligence as a matter of law, either one or a combination of the following factors was present: (1) there was nothing to prompt him

to enter the zone of danger; (2) the handling of the live wire was by a bare hand, a handkerchief, a pair of metal pliers wrapped with a handkerchief, a napkin, a woolen cap, a gloved hand, and so forth; or (3) some part of the body was placed in such close proximity to the danger that injury was inevitable. *Druse v. Pacific Power & Light Co.*, 86 Wash. 519, 150 Pac. 1182; *Billington v. Eastern Wisconsin R. & Light Co.*, 137 Wis. 416, 119 N. W. 127; *McNamee v. Western Union Tel. Co.*, 125 N.Y.S. 622, 140 App. Div 874; *Croteau v. Twin State Gas & Electric Co.*, 79 N. H. 515, 112 Atl. 397; *Barnett v. Des Moines Electric Co.*, 10 F. (2d) 111; *Capital Gas & Electric Light Co. v. Davis Adm'r*, 138 Ky. 628, 128 S. W. 1062; *Glander v. Milwaukee Electric R. & Light Co.*, 155 Wis. 381, 144 N. W. 972; *Menden v. Wisconsin Electric Power Co.*, 240 Wis. 87, 2 N. W. (2d) 856; *Williams v. Metropolitan Edison Co.*, 267 Pa. 158, 110 Atl. 92; *Owensboro City R. Co. v. Winfrey*, 191 Ky. 106, 229 S. W. 135; *Morris v. Kansas City Light & Power Co.*, 302 Mo. 475, 258 S. W. 431.

In the case at bar, there was evidence tending to show that the property of the decedent was in imminent danger of damage or destruction by fire generated by the live electric wire, and the means employed to handle the wire, the six-foot wooden 2x4, proved effective and safe when later used by another person to move the same wire. Although there may not have been such a sudden emergency as existed in some of the cited cases, nevertheless we are of the opinion that reasonable minds might differ on the question of whether, under the circumstances, the decedent acted as a reasonably prudent person in his desire to save his property from damage or destruction, and in the choice of instrumentality used to move the wire to a place where it would cause no damage to such property. The question of contributory negligence was properly submitted to the jury.

The appellant assigns as error the giving by the court of the following instruction:

"You are instructed that when a person is killed in an accident and can not be present and testify in an action brought on account of his death, the law presumes he exercised the care required of him to avoid the accident and was not guilty of contributory negligence. Presumption can only be overcome by the evidence of disinterested witnesses."

The instruction in and of itself was in accord with the law as declared in *Morris v. Chicago, M. St. P. & Pac. R. Co.*, 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19. The question presented is whether the instruction was applicable to the situation disclosed by the evidence.

The rule is based upon the idea that human experience has demonstrated that every person will use due care for his own safety, and therefore when a person is killed in an accident and there is no evidence to show what he did or did not do immediately preceding it, the law indulges in a presumption that the decedent had used due care. The presumption is not evidence, but serves in the place of evidence in favor of one party or the other until prima facie evidence has been introduced by the opposite party. The presumption may be overcome by the testimony of disinterested witnesses. *Morris v. Chicago, M. St. P. & Pac. R. Co.*, *supra*, and cases cited in the opinion.

The argument advanced by appellant as to why the instruction should not have been given is that, since all of the facts existing at the time of, and immediately prior to, the happening of the accident were testified to by witnesses produced by respondent, therefore the presumption of due care was overcome, and the jury should not have been permitted to have indulged in such a presumption. On the other hand, the respondent contends, in support of the instruction, that none of the eye-witnesses testified as to the acts of the decedent immediately prior to his coming in contact with the live wire, and cites authority to the effect that, if at any time there is a period, no matter how brief, during which the conduct of a decedent was not observed by an eye-witness, the presumption of due care must be submitted to the jury.

There would be much force to this argument if the appellant were claiming that the alleged contributory negligence of the decedent consisted in the manner in which he used the 2x4 with which he attempted to move the live wire to a place where it would not do damage to his property. But, as we understand the appellant's contention, it is that the decedent was negligent in knowingly and deliberately entering into a zone of utmost danger without any emergency created by imminent danger to property. The eye-witnesses testified as to all of the movements of the deceased in his approach to and entry into the claimed zone of danger, and therefore the question for the jury to consider was whether doing this and doing what he did in his attempt to protect his property amounted to negligence on his part, contributing to and proximately causing his death.

In this connection, there is some suggestion made that Mrs. Heber, the children, and a visiting friend who saw and testified to the movements of the decedent were not disinterested witnesses, and that, therefore, their testimony could not be used to overcome the presumption. In so far as *Morris v. Chicago, M. St. P. & Pac. R. Co., supra*, declares that the presumption of due care may not be overcome by testimony given by interested witnesses, it is possibly open to criticism. In the case of *Bradley v. S. L. Savidge, Inc.*, 13 Wn. (2d) 28, 123 P. (2d) 780, this court held that the presumption that the driver of an automobile involved in an accident was the agent of the owner and acting within the scope of his authority, arising out of proof of ownership of the automobile, may be overcome by competent evidence from either interested or disinterested witnesses, providing that their testimony is uncontradicted, unimpeached, clear, and convincing. However, it is unnecessary for us to review the *Morris* case and to decide whether or not this holding should apply to the presumption of due care with which we are here concerned, for, in our opinion, these witnesses were not "interested," within the meaning of the *Morris* rule.

■ Ordinarily, it will be found that, when reference is made to interested or disinterested witnesses, whose testimony may or may not overcome the presumption of due care, they are witnesses produced by a defendant whose interest lies in defeating the presumption. In this instance, however, the witnesses were produced by the plaintiff, whose case would benefit by its submission to the jury. It seems quite clear to us that such a presumption may very effectively be overcome by the testimony of those in whose favor it would otherwise run.

■ We are, therefore, of the opinion that the above-quoted instruction was inapplicable to this case, and that it was error to give it. The instruction was prejudicial to the appellant, in that it gave the jury the opportunity to find that the decedent was not guilty of contributory negligence by merely indulging in the presumption, regardless of how it might otherwise have weighed his conduct.

One of the assignments of error is with reference to an instruction upon the conduct of one who acts in a sudden emergency, and it urged that no such emergency was shown to have existed to justify the giving of such instruction. We find merit in some of the criticism made by appellant of the wording of the instruction, but, as a new trial is to be granted upon another ground, it is not necessary for us to decide whether the giving of the instruction in the language used constituted reversible error. The instruction may have given the jury the impression that an emergency existed, and also that the decedent was entitled to protect his property when it was endangered by fire.

It appears to us that the third paragraph of the instruction might better have been prefaced by informing the jurors that, if they believed from a preponderance of the evidence there was such imminent danger to the property of decedent as might prompt a reasonably prudent person, having due regard for his own safety, to act in order to save his property from damage or destruction, they would have a right to take that situation into consideration in determining the question of contributory negligence, rather than to assume

that an emergency existed.  We do not desire to direct the wording the court should use, but merely suggest a manner in which the instruction may be improved so as to meet the objection thereto, which we believe has merit.  The third paragraph of the instruction was proper, but should not be prefaced by words indicating that an emergency did in fact exist.

The appellant assigns as error the giving of instruction No. 5 as follows:

"You are instructed that it was the duty of the defendant to exercise the highest degree of care in the construction, maintenance, inspection and in the use of proper electrical appliances to insure the safety of those in lawful proximity of the same.  You are instructed that the defendant had the duty to inspect its lines at reasonable intervals and mend and keep them in repair.

"You are instructed that the defendant had the duty to properly install its electric lines and use wire that was in good condition and to see that said lines are not permitted to sag, and have proper tension upon them, and that they install the cross arms on their poles in a proper manner.

"You are further instructed that if you find that the defendant made repeated repairs to its lines in the vicinity where Harry Heber was killed, then the defendant is charged with the express notice of the condition which brought about the break in the line causing Harry Heber's death, and if you find from the preponderance of the evidence that the defendant was negligent in any of these respects and such was the proximate cause of the death of Harry Heber, then your verdict should be for the plaintiff, unless you also find that the decedent Harry Heber was guilty of contributory negligence as defined in these instructions."

The appellant argues that, by the first sentence of the instruction, the court informed the jury that the appellant was an insurer of the safety of those in lawful proximity to its wires.  In the language used, the court was informing the jury as to the measure of care the appellant must have exercised in connection with the maintenance of its electrical distribution system, and considering this in connection with instruction No. 8, by which the jury was in-

structed that the appellant was not an insurer of the safety of the decedent, we do not think any reversible error was committed.

■ It is also urged that the second paragraph of the instruction improperly submitted to the jury the duty of inspection, the duty to use wire in good condition, and the duty to install cross-arms properly. There was evidence in the record justifying the instruction with reference to the duty to inspect the lines and the use of wire in good condition, but we find no substantial evidence that there was anything wrong about the cross-arms. The respondent made complaint that rope was improperly used to maintain two cross-arms in a horizontal position, but we find nothing showing any. causal connection between that situation and the falling of the wire.

The appellant contends that there is an inconsistency between instruction No. 5 and instruction No. 7, in that instruction No. 5, in effect, informs the jury that appellant had notice of the conditions causing the wire to break by reason of previous breaks, while instruction No. 7 informed the jury that, if it found that the wire broke and fell during the hours of darkness, preceding, by a few hours, the death of the decedent, and further found that neither the defendant nor any of its employees or agents knew, or by the exercise of reasonable diligence should have known, that such wire had broken and fallen, then its verdict should be for the appellant.

■ The two instructions cannot be said to be inconsistent because they relate to different subjects. Instruction No. 5 deals with notice of the defective condition of the wire which caused it to break, while instruction No. 7 deals with notice of the breaking of the wire causing the death of the decedent. In this connection, it is well to have in mind that whether notice, actual or constructive, is required as a condition precedent to liability, depends upon the existence of negligence upon the part of the one causing that which brought about the accident of which complaint is made. If the breaking of the wire was due to the negligence of

appellant, of which previous similar breaks would be evidence, then notice of any kind, either actual or constructive, of this particular break, would not be necessary. The same rule would apply to the condition to which instruction No. 7 was directed. If the break could not have been anticipated and the charge of negligence were based solely upon the failure to promptly shut off the current or remove the wire so that it could not do injury, then proof of notice would be required; but if it were found that the appellant was negligent in the maintenance of the wire that broke, neither notice of its defective condition nor that it had broken would be necessary.

In the case of *Murray v. Seattle*, 96 Wash. 646, 165 Pac. 895, the city of Seattle was charged with negligence in not removing an obstruction consisting of fallen wires across a street. The city claimed it was not liable to an injured traveler because it did not have notice of such obstruction prior to the injury. In that case, we said:

"If the sole negligence relied on by plaintiffs had been that of the failure of the defendant to remove the obstruction within a reasonable time after knowledge, actual or constructive, of its existence, we would be inclined to hold that the evidence was not sufficient. But it must not be overlooked that it is alleged in the complaint, and there is substantial evidence in the record to sustain the allegations, that the defendant was guilty of negligence which caused the obstruction to be in the street. In such case the condition complained of is due to the act or neglect of the city itself, and no notice of any kind, either actual or constructive, is necessary. It is only in cases where the negligence relied on is the failure of the city to remove an obstruction or to repair a defect in the street not caused by its own act or neglect that the question of notice of the obstruction or defect is an essential element."

See, also, 20 C. J. 359, Electricity, § 45; 29 C. J. S. 596, Electricity, § 47. We think that, instead of telling the jury that, if repeated repairs were made in the vicinity of the accident, the appellant would be thereby charged with express notice of the condition which brought about the break in the line, the question whether such conclusion would

follow should have been submitted to the jury to be determined, and that both instructions Nos. 5 and 7 should embody the idea embraced in the quotation from the *Murray* case, *supra*.

■■ The appellant offered to prove the value of the chicken house that was endangered by the fallen wire, and such offer was rejected. This evidence was admissible, as it would have a bearing upon the question of whether the decedent acted as a reasonably prudent and careful person in entering a zone of danger to prevent injury or loss to his property. *Wardrop v. Santi Moving & Express Co.*, 233 N. Y. 227, 135 N. E. 272.

The appellant claims the award of damages was excessive. No error is assigned upon any instruction of the court as to the measure of damages, or concerning the factors the jury might consider in arriving at the amount thereof, and we, therefore, do not deem it necessary to discuss this question, but leave it for determination by the jury when the case is retried.

The judgment is reversed, and the cause remanded for a new trial.

MALLERY and HILL, JJ., concur.

SIMPSON, J. (dissenting)—I find it necessary, in order to make my position clear, that some additional facts be stated other than set out in the majority opinion. In stating these facts, I mention only those testified to by witnesses for the respondent.

The Hebers lived at 409 south Water street in the city of Ellensburg. The dwelling was about eighty-five feet from the place where Heber was killed. Heber, sixty-one years of age, formerly a rancher and service station operator, had worked in the city of Ellensburg for four or five years as a city employee, doing street work, fixing ditches, and cleaning streets.

The power line of appellant company ran along Manitoba street on the south side of the Heber property, and then turned at right angles and ran north along the alley along

the rear west end of the Heber property. Sometime during the early morning hours of March 13, 1947, a middle bare wire of the three-wire span running from the pole at the southwest corner of the lot along the south side of the property, had broken from some unknown cause. The break occurred at a point close to the corner pole, with the result that the center wire fell to the ground below the pole, the end of the wire curling around the fence of a chicken yard located at the southwest corner of the Heber property. At approximately three o'clock on that morning, Mr. Heber awakened his wife and told her that he heard something. She got up and went to the back porch, which is located on the northwest corner. As she returned to bed, she heard what she termed "funny-like noises."

Later at five o'clock, she arose and, looking toward the southwest corner of the lot, noticed smoke in the vicinity of the bottom of the power pole. She then awakened her husband and told him that the noises they had heard earlier were from a broken wire. They went outside to see if they could find where it was broken. They returned to their house, where Mrs. Heber prepared breakfast. She then called Pat Hamilton, a lineman for the city light company, whose wires were also carried by the poles. She contacted Mr. Hamilton at 5:45, and he said that he would try to get in touch with the proper parties. He was able to contact Mr. Wines, one of appellant's linemen, at approximately twenty minutes to seven.

At about the same time, one of the respondent's daughters noticed some fire in the straw close to the chicken yard. Mrs. Heber said the fire was burning in the straw, and that a couple of poles were on fire. Others testified there was some straw burning there, and also that some boards were on fire. It is agreed the fire was not a large one, and, as Mrs. Heber said, the straw "was really too damp to burn. It just smoldered."

In spite of his wife's objections, Mr. Heber determined to put out the smoldering fire. He took a bucket of water from the kitchen sink in the house and walked with his wife to

the chicken yard, where he threw the water on the fire. Mrs. Heber returned to the house and sent their son Harry with another bucket of water, which Mr. Heber threw on the straw. During this time, the electric wire was twisting about, sparking and "jumping all around." Heber cautioned his son to stand back, and then secured a 2x4, about six feet in length, walked around the chicken house and yard, out into the alley, and approached the base of the pole. He then tried to move the wire from the chicken yard to the light pole. As he was pushing the wire, it somehow came in contact with him, or came near his right arm, and this resulted in his death. As Heber fell, he dropped the 2x4, and his son, with the aid of Mrs. Heber, pulled him into the street.

It is my contention that Mr. Heber was guilty of contributory negligence as a matter of law, and that his wife cannot recover.

This court stated in *North Coast Power Co. v. Cowlitz, C. & C. R.*, 108 Wash. 591, 185 Pac. 615:

"It is, according to both reason and authority, the rule that what would be due care under certain circumstances would not be due care under other or different circumstances, and that, if anything in the surrounding conditions and circumstances reasonably suggests the necessity for an increase of care to avoid peril and damage, the duty to increase such care proportionately increases. This court, in *Helliesen v. Seattle Elec. Co.*, 56 Wash. 278, 105 Pac. 458, tersely said: 'In determining the question of contributory negligence due care or ordinary prudence is the only known test.' "

Again we stated in *Morris v. Chicago, M. St. P. & Pac. R. Co.*, 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19:

"The doctrine of contributory negligence is based upon the principle that no person is ever absolved from exercising reasonable and ordinary care for his own safety."

The general rule is stated as follows:

"One who has notice of the dangerous condition of a wire or other electrical appliance and voluntarily or recklessly brings himself into contact with it cannot hold the company for the resulting injuries, and this is true of any adult, al-

though he is wholly unskilled in the handling of electricity. To give rise to this defense, however, it must be shown that plaintiff in coming in contact with the appliances voluntarily and unnecessarily or negligently exposed himself to danger." 29 C. J. S. 606, Electricity, § 53.

This statement is supported by twenty-three decisions of courts of last resort in thirteen states, and three Federal opinions.

It is not necessary in this case to adopt any new theory in order to decide this case. This court in *Druse v. Pacific Power & Light Co.*, 86 Wash. 519, 150 Pac. 1182, had before it facts so entirely alike to those in the present case that it is impossible to arrive at any other conclusion but that Mr. Heber was guilty of contributory negligence as a matter of law. In that case, Druse, a farmer, was moving a hay derrick under a high power transmission line belonging to the Pacific Power & Light Company. The power line consisted of three high-tension wires, one set on the top of the pole, and one on each end of a cross-arm, a short distance below. There was a sag of four or five feet in the power wires.

The outfit which Mr. Druse was using was dragged about by two teams of horses. Druse attempted to move the derrick under the power line, when the top of the mast came in contact with some telephone wires which were under the power line. The force of the contact was such that the two poles were pulled together, allowing the power wires to sag far enough to come in contact with the derrick. The derrick was rigged with two wire cables, called the supporting cable and the pull cable. The one supported the arm of the derrick, and the other was used to pull the hay onto the stack. After coming in contact with the power line, the pull cable showed signs of electricity where it struck the ground. As the progress of the derrick was stopped by the wires, Druse attempted to lower the arm of the derrick by unloosening the supporting cable where it was attached to the cross-beam by a hemp rope. He took hold of the rope about a foot from the cross-beam, and then removed it from an iron hook. He then attempted to jerk the rope loose, but before

making the pull, received a shock of electricity through the rope which resulted in his death.

The court, in further summarizing the evidence, said:

"We think the record will bear the stronger statement that there was a 'rumbling' 'crackling' 'loud noise' and 'blue flames' and a 'spitting' of electricity which was 'apparently continuous;' that sparks were flying from the metallic parts of the derrick, except the fall of the supporting cable—it showed a contact at the block at the top of the mast—and that the grass was burning where it came in contact with the pull cable, which was dragging 40 or 50 feet back on the ground. It was evidently Druse's idea that if the supporting cable, which was tied to the mast by a hemp rope, was released and the arm pulled away from the wire, that the derrick would be freed of the contact. . . .

"Admitting that respondent's wires were not high enough to permit a free passage of the derrick, we think Mr. Druse was clearly guilty of contributory negligence and that such negligence was the proximate cause of his death. The day was a clear day. There was nothing to obscure his sight. The derrick was moved slowly across the field. It must have been apparent to a casual observer that the clear way might be insufficient, in plenty of time to stop the derrick so as to avoid the contact. He might have done as he did the year before under a like condition, climbed the mast and passed the telephone wires over its top. Mr. Druse was a man of more than ordinary intelligence, and from all the prior circumstances must have known the danger of a contact with an electric current. . . .

"Up to this point decedent was in no danger. Indeed, he was charged with a higher duty to protect himself. It was then immaterial how the condition arose. It was enough that it existed. It was open, obviously dangerous and known to be deadly. Instead of keeping away from it until the company could be telephoned to cut off the current, as was done immediately after the accident, Mr. Druse, over the protest and warning of at least two of his men, deliberately set about to correct the situation, placing his hands within a few inches, or at most within a foot, of the hook on the end of the supporting cable, and within two or three feet of the log chain, which was spitting fire. . . .

"Can there be any difference in the minds of reasonable men as to the negligence of the deceased and the proximate and contributing cause of his death? In other words, with

a danger open and obvious, can any one say that he acted as a prudent man should have acted under like circumstances?

"We find that deceased was guilty of contributory negligence as a matter of law."

Just before he was killed, Druse directed one of his employees to go into the framework of the derrick and untie the rope and let the arm down so they could proceed. The man refused, saying, "Not on your life. I wouldn't go in there for ten thousand dollars." Another one of the men said to Druse, when he was about to take hold of the rope, "keep away from there."

I now call attention to the following cases, with facts similar to those present in the case at bar, which support the reasoning of our *Druse* case:

In *Billington v. Eastern Wisconsin R. & Light Co.*, 137 Wis. 416, 119 N. W. 127, the facts showed that plaintiff, twenty-five years of age, saw some boys playing with a broken electric wire by placing sticks on the exposed end of the copper wire where it was stripped of its insulating covering. He walked to where they were, saw that the wire was emitting sparks and that it burned the sticks pressed against it. He stooped down, took hold of the wire with his left hand at the place where it was coated with insulating material, and some two feet from the exposed and sparking end, for the purpose of throwing it over the branch of a nearby tree. When his hand came in contact with the live wire, he was severely shocked and his hand badly burned. The supreme court of Wisconsin held that he was guilty of contributory negligence, and that he could not recover.

The facts in *Glander v. Milwaukee Electric R. & Light Co.*, 155 Wis. 381, 144 N. W. 972, showed that a fireman attempted to break or move a live wire with his hands. The court held that he was guilty of contributory negligence and that his widow could not recover.

The facts being almost identical with those in the last case, the court in *Menden v. Wisconsin Electric Power*

*Co.*, 240 Wis. 87, 2 N. W. (2d) 856, held that there was contributory negligence which precluded recovery.

In *Croteau v. Twin State Gas & Electric Co.*, 79 N. H. 515, 112 Atl. 397, it appears that the plaintiff was injured by electric wires when he attempted to cut them with a pair of pinchers, around which he had wrapped his handkerchief. The court held that he could not recover because of his own contributory negligence.

The facts in *Williams v. Metropolitan Edison Co.*, 267 Pa. 158, 110 Atl. 92, were: A painter swung a scaffold beneath wires which came about six inches above his head, so that he, was electrocuted when he voluntarily or involuntarily raised his hand. The testimony did not show how he came in contact with the wire. However, the court held that he was contributorily negligent in placing the ladder too close to the live wires. The supreme court of Pennsylvania held that the action should be dismissed.

In *Chernuka v. Philadelphia Electric Co.*, 320 Pa. 193, 182 Atl. 543, it appears that a man was electrocuted when he fell on a live electric wire, which, because of an electric storm on the preceding night, sagged near the ground. As he approached, he stumbled on a stone and fell on the wire. The court held that he was contributorily negligent and recovery could not be had.

The plaintiff in *Morris v. Kansas City Light & Power Co.*, 302 Mo. 475, 258 S. W. 431, had knowledge that the broken end of a live wire was hanging from a branch of a tree, and approached to within two feet of it. He was injured when the wire fell from the tree and struck him. The court held that he was guilty of contributory negligence as a matter of law and could not recover.

The court in *Owensboro City R. Co. v. Winfrey*, 191 Ky. 106, 229 S. W. 135, held that a man was guilty of contributory negligence, which precluded recovery, when he attempted to unloosen from a wagon a team which was being shocked by electricity.

The court in *Kentucky & West Virginia Power Co. v. Brown's Adm'x.*, 281 Ky. 133, 135 S. W. (2d) 70, held that

one taking hold of an electric wire after asking another if there was any juice in it, and being informed that the person questioned did not know, was contributorily negligent as a matter of law, so as to bar recovery of damages from the power company for death resulting from electrocution.

The facts in *Morton's Adm'r v. Kentucky-Tennessee Light & Power Co.*, 282 Ky. 174, 138 S. W. (2d) 345, show that a state highway commission's employee was electrocuted when a steel rod, which it was found necessary to remove in the process of painting and repairing a bridge, came in contact with an electric wire, which, at the point of the accident, was eleven feet from the bridge and which was maintained on the power company's right of way, almost parallel with the bridge. The rod had been loosened and the employee was pulling it across with the end protruding far over to the side of the bridge in order that it could be passed beneath the intersecting rod and be lowered to the floor. In extending it back, the rod came in contact with the electric wire and the employee was electrocuted. The trial court directed a verdict for the defendant upon two grounds, one of which was that the workman was guilty of contributory negligence. The court of appeals of Kentucky affirmed the action of the trial court.

The supreme court of Arkansas in *Gullett v. Arkansas Power & Light Co.*, 208 Ark. 44, 184 S. W. (2d) 819, held that decedent, who met his death by electrocution while attempting to row a boat beneath high-tension wires which he knew were dangerous, at a point where the wires were only eighteen to twenty-four inches above flood waters, was guilty of contributory negligence, and that the owner of the power line was not liable for the death.

The trial court in *Aller v. Iowa Electric Light & Power Co.*, 227 Iowa 185, 288 N. W. 66, directed a verdict for the defendant. The facts in that case showed that a farmer, who was attempting to connect a cable to the end of a hay carrier track on a barn, knowing that the closest wire of the electric transmission line was between eighteen and nineteen feet from the barn and that the wires were not insulated,

and who was looking directly toward the place where the cable came in contact with the transmission line, was guilty of contributory negligence as a matter of law in drawing the cable in contact with the transmission line, and could not recover for his injuries. The action of the trial court was affirmed.

In *Bartuluci v. San Joaquin Light & Power Corp.*, 21 Cal. App. (2d) 376, 69 P. (2d) 440 (2d case), it was held that a farmhand was contributorily negligent as a matter of law so as to preclude recovery from the power company for electrical burns, where the top of the boom of a hay derrick caught on an overhead power line and the farmhand took hold of a steel cable hanging down from the boom to pull the boom away from the power line.

The court in *Dresser v. Southern California Edison Co.*, 28 Cal. App. (2d) 510, 82 P. (2d) 965, held that a laborer who knew of the proximity of high-power transmission lines to an electrically-driven pump, but who, without regard to the wires, raised the pump rod until it contacted the exposed wires overhead, was not entitled to recover from the power company for burns received because of his own contributory negligence.

These cases indicate the attitude of all of the courts, including our own, which is that one who approaches a live electric wire does so at his own risk, regardless of the instruments he may use to protect himself.

The use of electric energy in the industries and the arts, in communication and transportation, for lighting and for motive power, in the house, the shop, the factory and the foundry—in the city and the country—is so universal that knowledge of its dangerous qualities and characteristics must be assumed to be common to all persons of normal intelligence and experience; so that, where such a person voluntarily comes into contact with, or approaches nearer than a reasonably prudent person would, to a wire or other thing which he knows, or as a person of ordinary knowledge and experience has reason to believe, is sufficiently charged with electricity to be dangerous, and, in consequence of

such contact or proximity is shocked and injured, it will be assumed as a matter of law that his own negligence contributed to the accident. *Shade v. Bay Counties Power Co.*, 152 Cal. 10, 92 Pac. 62; *Stackpole v. Pacific Gas & Electric Co.*, 181 Cal. 700, 186 Pac. 354; *Bartuluci v. San Joaquin Light & Power Corp.*, *supra*.

Mr. Heber was a man of mature years, with much experience in the manner in which business is conducted. He had been in Ellensburg for five years, working on the streets, and knew that electric wires were dangerous to handle. He moved into a dangerous situation when he attempted to move the wire with a piece of lumber. He approached the sparking, jumping, twisting wire in the face of warning from his wife, and after he had instructed his son to stay behind him.

It is surely unjust for the appellant company to be charged with the foolhardy act of this man. The majority seek to excuse Mr. Heber's action. by contending that a situation existed which would prompt a reasonable man to act in order to save endangered property from damage or destruction. Several cases have been cited to uphold this theory. The facts in those cases are so entirely different from the one at bar that I must call attention to the contents of at least two of them.

In *Leavenworth Coal Co. v. Ratchford*, 5 Kan. App. 150, 48 Pac. 927, the facts were: A storm occurred in the city of Leavenworth, Kansas, and ceased about four o'clock in the morning. About six o'clock in the morning, the person injured had his attention called to the fact that his stable or shed in the rear of the premises was on fire. He went to the door of his residence and discovered that one of the wires of the electric light company had broken, and a part of it had fallen across the roof of his shed, from which was issuing sparks and a blaze of fire, apparently endangering his building. He immediately, without any hesitation, picked up a baseball bat, ran out to his shed, and pushed the wires off the building onto the ground. In falling, the wire in

some way came in contact with him and he was severely injured.

It appears in *Temple Electric Light Co. v. Halliburton,* (Tex. Civ. App.) 136 S. W. 584 (Motion for rehearing denied, 104 Tex. 493, 140 S. W. 426), that a man came home, attempted to use his telephone, received a slight shock, and then discovered that the wire was emitting sparks. He took pliers to cut the wire and was stricken with a current of electricity, which caused his death in a few minutes. Evidence showed that he cut the wire for the preservation of his home from fire, and that he believed he was in no danger. It must be borne in mind that his act of cutting the wire was immediately after he had attempted to use the telephone.

I have no quarrel with the rule as laid down in these cases, but in their application to the facts as presented in the present case.

The situation in the case at bar is very similar to that which confronted the plaintiff in *Barnett v. Des Moines Electric Co.,* 10 F. (2d) 111. It appears in that case that the plaintiff Barnett was eating dinner about 7:30 when the lights went out. He went outside and observed that the wires strung in front of his house had broken. One had fallen across the pavement and doubled back in a semicircle in front of his house. Some distance away, several children were playing, and plaintiff decided that the sparking, live wire in the street was a menace to those children. (That element is not present in the case at bar.) Then defendant placed a napkin around the wire, picked it up, and started to carry it over to the sidewalk and out of the street. He moved the wire across the avenue to the curbing, and then received a severe shock when he stepped onto the parking strip. He testified that he was trying to save the children because he knew that the line was charged and sparking, but that he had in mind that the napkin was sufficient protection.

The court said:

"It is well settled as a general rule that, where a person with knowledge of the dangerous character of an electric

wire purposely comes in contact with it, he is guilty of contributory negligence and cannot recover for the resulting injury.. [Citing cases.] . . .

"In the instant case, the plaintiff knew the wire was an electric light wire. He was attracted to the scene by the electric lights going out in his house. He saw it emitting a glow at the pole to which the other end was attached. He believed it to be dangerous to touch, because he gave as his reason for attempting to remove it his fear that the children might come in contact with it and be injured. He appreciated it was dangerous, because he undertook to test it with his fingers before taking it into his hands. He devised his own method of protection, to wit, the linen napkin folded about the insulation. There was no impending danger to any other person. The circumstances required no hasty or ill-considered action. He had time for deliberation and reflection. He voluntarily seized a dangerous electric wire in his hands and undertook to carry it out of the street. Such being the undisputed facts, we cannot say that the learned District Judge erred in holding that plaintiff was guilty of contributory negligence as a matter of law, precluding his recovery."

In that case, reference was made, as is made here, to the emergency rule and the cases which had been cited touching upon the acts of persons, during emergencies, when they attempted to move electric wires to save human lives or rescue persons in danger. In discussing that type of case, the court made the following remarks:

"In the Eckert Case [*Eckert v. Long Island R. Co.*, 43 N. Y. 502, 3 Am. Rep. 721], as stated by the court, plaintiff's intestate had no time for deliberation. He was called upon to act instantly. A moment's delay would have been fatal to the child. No such condition existed in the case at bar. Not only did plaintiff have time for reflection, but he did reflect. He folded a napkin about the wire. He tested the wire with his fingers. He then seized it and commenced to carry it across the street. The children, whom he sought to shield according to his own testimony, were 25 or 30 feet from the place where he picked up the wire. They were not approaching the wire. They were in no immediate danger of coming in contact with it. His act was to guard against future possible danger to the children, and not danger that was imminent, calling for immediate action, and giving no time for reflection or consideration.

"The distinction between the instant case and the Eckert Case exists in practically all the cases cited and relied upon by counsel for plaintiff."

In studying the cases cited, it will be found that the rule relative to acting in an emergency takes into consideration the time element—that is, that the party injured did not have time to reflect but acted instantly, with the idea in mind of protecting human life or property. That is not present in the case at bar. Heber knew that something was wrong about three o'clock in the morning. Later, at five o'clock, he was told by his wife that the noises came from a broken wire. He then went outside and made an investigation, found a wire broken, and returned to the house. They then called a lineman for the city light company at 5:45. It was about that time that it was noticed there was some fire in the straw close to the chicken yard. Mr. Heber did not act in an emergency, but had plenty of time for deliberation.

The emergency rule does not apply when an attempt is made to rescue property in the face of an obvious danger such as no reasonably prudent person would, under like circumstances, incur. No one should be permitted to recover for injuries sustained in attempting to protect mere property in the face of obvious danger. Heber's act was not done in an emergency, for, at the time he performed the act of attempting to remove the wire, no emergency existed. Too, there is a clear distinction between the risk which a man may take in rescuing his property and saving human life. And in the case of property exposed to danger by the negligence of another, he must not act recklessly, but with such prudence as the circumstances will admit of; and the plaintiff cannot invoke even that rule of emergency where the property is imperiled by his own negligence.

This rule is well established by the case of *Foster v. New York Central R. Co.,* 115 W. Va. 682, 177 S. E. 871. There the deceased was fatally injured in attempting to urge his cow from the railroad track of the defendant in view of an approaching passenger train. The court considered the question so well, and stated the proposition so clearly, that I quote from it as follows:

"No one should be permitted to recover for injuries sustained in attempting to rescue mere property in the face of obvious danger such as no reasonably prudent man would, under the circumstances, incur. 20 R. C. L. 133. In *Eckert v. Long Island Railroad Co.*, 43 N. Y. 502, where damages were sought for the death of one struck and killed by a train of the defendant while he was rescuing a child from the track, the court said: 'The evidence showed that the train was approaching in plain view of the deceased, and had he for his own purposes attempted to cross the track, or with a view to save property placed himself voluntarily in a position where he might have received an injury from a collision with the train, his conduct would have been grossly negligent, and no recovery could have been had for such injury. * * * The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons. For a person engaged in his ordinary affairs, or in the mere protection of property, knowingly and voluntarily to place himself in a position where he is liable to receive a serious injury, is negligence, which will preclude a recovery for an injury so received; but when the exposure is for the purpose of saving life, it is not wrongful, and, therefore, not negligent, unless such as to be regarded either rash or reckless.' In *Morris v. Lake Shore & M. S. Ry. Co.*, 148 N. Y. 182, 42 N. E. 579 (an action to recover damages for the death of a person killed by a railroad train while he was attempting to drive his cattle across the track), the court, answering the contention of plaintiff that the decedent was justified in placing himself in a position of danger to rescue his property from injury or destruction, stated: 'We think the principle contended for cannot be sustained. In *Eckert v. Railroad Co.*, 43 N. Y. 502, it was in effect held that a person could not place himself in a situation of danger simply for the protection of his property without being guilty of such negligence as would preclude his recovery.' "

Other cases approving this rule are: *Pike v. Grand Trunk R. Co.*, 39 Fed. 255; *Seale v. Gulf, Colorado & Santa Fe R. Co.*, 65 Tex. 274, 57 Am. Rep. 602; *Cook v. Johnston*, 58 Mich. 437, 25 N. W. 388, 55 Am. Rep. 703; *Hinchy v. Manhattan R. Co.*, 49 N. Y. Super. Ct. 406; *Berg v. Great Northern R. Co.*, 70 Minn. 272, 73 N. W. 648, 68 Am. St. 524; *Deere v. Southern*

*Pac. Co.,* 123 F. (2d) 438 (Certiorari denied—315 U. S. 819, 86 L. Ed. 1217, 62 S. Ct. 916); *Gwaltney v. Kansas City Southern R. Co.,* 339 Mo. 249, 96 S. W. (2d) 357; *Morgan v. Treadwell,* 23 Tenn. App. 100, 126 S. W. (2d) 888.

The evidence produced in this case shows conclusively that Mr. Heber was guilty of contributory negligence as a matter of law. The case should be dismissed.

In any event, the statement made by the majority that the presumption of due care can only be overcome by "the testimony of disinterested witnesses" is incorrect.

Subsequent to the decision in *Morris v. Chicago, M. St. P. & Pac. R. Co.,* 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19, this court decided that presumption may be overcome by the competent evidence of either interested or disinterested witnesses. See, *Bradley v. S. L. Savidge, Inc.,* 13 Wn. (2d) 28, 123 P. (2d) 780; *Carlson v. Wolski,* 20 Wn. (2d) 323, 147 P. (2d) 291; *Hanford v. Goehry,* 24 Wn. (2d) 859, 167 P. (2d) 678; *Pickering v. Hanson,* 28 Wn. (2d) 603, 183 P. (2d) 487; *Roletto v. Department Stores Garage Co.,* 30 Wn. (2d) 439, 191 P. (2d) 875.

SCHWELLENBACH, J. (concurring in the result of the majority)—I agree with Judge Simpson that, under the facts of this case, the deceased was guilty of contributory negligence as a matter of law, *unless* he acted in a sudden emergency. Whether or not he so acted in a sudden emergency was a question of fact to be determined by the jury under proper instructions.

I agree with the majority that the presumption of due care is based upon the idea that human experience has demonstrated that every person will use due care for his own safety, and therefore when a person is killed in an accident and there is no evidence to show what he did or did not do immediately preceding it, the law indulges in a presumption that the decedent had used due care. However, the facts in this case did show what the decedent did immediately preceding the accident, and for that reason there can be no presumption that he used due care. It is only where the evi-

dence is silent as to the question, that due care is presumed. There was therefore no presumption to overcome.

I concur in the result reached by the majority.

October 31, 1949.  Petition for rehearing denied.

